Nathaniel ROBERTS, Individually and on Behalf of the Certified Class, et al., Plaintiff(s),

v.

COUNTY OF MAHONING, et al., Defendant(s).

No. 4:03 CV 2329.

United States District Court, N.D. Ohio, Eastern Division.

March 10, 2005.

Robert P. Armbruster, Armbruster, Kelley, Kot, Honeck & Baker, Akron, OH, for Plaintiffs.

Thomas Kelley, Armbruster & Kelley, Akron, OH, for Plaintiffs/Defendants.

Sharon K. Hackett, Linette M. Stratford, Paul J. Gains, Office of the Prosecuting Attorney, Youngstown, OH, Thomas N. Michaels, Cleveland, OH, for Defendants.

## MEMORANDUM OPINION

(Including Findings of Fact and Conclusions of Law)

DOWD, District Judge.

I. Background ...................................................... 673

II.  Findings of Fact ........................................................ 674
     A.  The Duties of the Defendants ........................................ 674
     B.  Experts ............................................................ 674
     C.  Description of the Justice Center ................................... 675
     D.  Description of the MSJ .............................................. 677
     E.  Status of Prisoners ................................................ 678
     F.  Variances .......................................................... 678
     G.  Non–Compliance With the Variances .................................. 679
     H.  Population Trends .................................................. 679
     I.  Staffing Levels at the Two Facilities .............................. 680
     J.  Prior Litigation ................................................... 681
     K.  Financial Difficulties Facing Mahoning County ...................... 682
     L.  Staffing Levels From Date This Action Was Filed (November 14, 2003) ..... 683
     M.  Discipline Issues .................................................. 685
     N.  Lockdowns .......................................................... 686
     O.  Lack of Training ................................................... 687
     P.  Security Breaches .................................................. 688
     Q.  Maintenance Issues ................................................. 688
     R.  Legal Access ....................................................... 688

III. Applicable Law ......................................................... 689
     A.  Conditions of Confinement .......................................... 689
     B.  Legal Access ....................................................... 691

IV.  Conclusions of Law ..................................................... 691
     A.  Conditions of Confinement .......................................... 691
     B.  Legal Access ....................................................... 692

V.   Summary Conclusion ..................................................... 692

VI.  Remedy ................................................................. 692

## I. Background

On December 13–15, 2004, the above-captioned matter was tried to the Court. The parties have submitted their post-trial briefs and the matter is ripe for determination.

In this matter, commenced on November 14, 2003 and brought pursuant to 42 U.S.C. § 1983, the named Plaintiffs sued the County of Mahoning, its Sheriff and its Commissioners, alleging that conditions of confinement at the Mahoning County Justice Center ("Justice Center") and the Minimum Security Jail ("MSJ") violate the Fourteenth Amendment, which prohibits punishment without due process of law, and the Eighth Amendment, which prohibits cruel and unusual punishment. The plaintiffs sought equitable and declaratory relief.

The named Plaintiffs, both pretrial detainees and convicted prisoners being held in the custody of the defendant Sheriff at either the Justice Center or the MSJ, allege that these two facilities are understaffed and overcrowded, creating unsafe and dangerous conditions for the inmates. Plaintiffs allege that the lack of staff results in (1) the frequent lockdown of inmates for lengthy periods of time, (2) the inability to provide programs and services to the inmates, including but not limited to, recreation, visitation, religion, and inmate counseling programs, and (3) an inability to safely and securely house inmates. They further allege that the staff is not properly trained. Plaintiffs allege that the facilities are poorly maintained, creating unhealthy and dangerous conditions for the inmates. They assert that inmates are

locked down in cells with toilets that accumulate human waste because they cannot be flushed and with intercoms that do not work, prohibiting the inmates from contacting staff during periods of lockdown. Plaintiffs also claim that the jail does not provide adequate legal resources or a legal access program, thus violating their constitutionally guaranteed right of access to the courts.

The Plaintiffs exhausted all administrative remedies prior to filing this lawsuit as a proposed class action. On March 5, 2004, the Court certified the following class:

> all persons in the care or custody of the Mahoning County Sheriff and incarcerated on or after November 12, 2003 at the Mahoning County Justice Center, 110 Fifth Avenue, Youngstown, Ohio, ("Justice Center") and also all persons in the care or custody of the Mahoning County Sheriff and incarcerated on or after November 12, 2003 at the Mahoning County Minimum Security Jail, 360 W. Commerce Street, Youngstown, Ohio ("MSJ").

On December 13–15, 2004, the case was tried to the Court. After the trial adjourned, the Court allowed an opportunity for the parties to file post-trial briefs. The matter is now ripe for determination and the Court hereby makes its findings of fact and conclusions of law pursuant to Fed. R.Civ.P. 52(a).[1]

## II. Findings of Fact

### A. The Duties of the Defendants

1. The Mahoning County Sheriff is charged with the duty of operating both the Justice Center and the MSJ and with providing for the health and safety of the inmates incarcerated there. (Complaint ¶ 12; Answer ¶ 12).

2. Mahoning County is empowered by the laws of Ohio to operate both facilities and is required to collect and expend revenue to do so. (Complaint ¶ 14; Answer ¶ 14).

3. The Mahoning County Commissioners, on behalf of Mahoning County, are responsible for funding the operation of the two facilities and for taking all other actions necessary for the operation of the facilities. (Complaint ¶ 13; Answer ¶ 13).

### B. Experts

4. There were four experts whose reports were used for this litigation.

5. Robert Pace, the former jail administrator for the Cuyahoga County Jail and currently a jail consultant operating his own company, Managed Confinement, was approached by Glen Kountz, the president of the F.O.P., with a request to prepare a staffing analysis for the jail. Pace was reluctant to do so absent approval of Sheriff Wellington and the entire F.O.P. After meeting with the Sheriff and the F.O.P. in September 2003 and receiving assurances of support, Pace agreed to do the analysis. (Pace Tr. 119, 126–28). In conjunction with the staffing analysis, Pace also drew conclusions regarding the inmate population. Pace's report is contained in the record (Plaintiffs' Exh. 35) and he testified at trial. (See Tr. 119–64). His conclusions are referenced in the appropriate sections of this opinion and, wherever so referenced, those opinions are expressly accepted by the Court.

6. Lois A. Ventura, Ph.D., currently employed as an assistant professor at the

---

1. Transcripts of the trial are contained in the record. See Doc. Nos. 87, 88, 89. All references to testimony are in the following form: "[Name of witness] Tr. [page number]".

The parties also submitted a "proposed" Joint Stipulation of Facts (Doc. No. 73) which, at the trial, were verified as having been consented to by all parties. See Tr. 2.

University of Toledo and the director of the University's graduate program of criminal justice, was hired by the plaintiffs to make an assessment with respect to inmate safety at the jail. (Ventura Tr. 166). Ventura's report is contained in the record (Plaintiffs' Exh. 33) and she also testified at trial. (*See* Tr. 165–256). Her conclusions are referenced in the appropriate sections of this opinion and, wherever so referenced, those opinions are expressly accepted by the Court.[2]

7. James G. Ricketts, Ph.D., a correctional consultant, was hired as the Defendants' expert to give opinions with respect to the major issues in the case. His report is in the record (Defendants' Exh. S) and he testified at trial. (*See* Tr. 709–59). His opinions are not referenced herein as they were mostly rejected by the Court.

8. In addition, after the Justice Center first opened, a dispute arose regarding staffing levels and whether they were in compliance with a Consent Decree in earlier litigation relating to the Mahoning County Jail. The parties to that litigation agreed that the Court should appoint Gerry D. Billy, Sheriff of Licking County, Ohio, to conduct an in-depth staffing analysis. (Billy Tr. 88). Sheriff Billy's report is contained in the record (Plaintiffs' Exh. 34) and he testified at trial (*see* Tr. 75–118). His conclusions are referenced in the appropriate sections of this opinion and, wherever so referenced, those opinions are expressly accepted by the Court.

## C. Description of the Justice Center

9. The Justice Center was newly constructed and opened in 1996. The building houses the Sheriff's department and the jail. (Joint Stipulation 1) [hereafter "Stip. # "].

10. The facility is a multi-story high rise building, which has two towers, North and South. Each tower is served by two elevators—one for visitors and the other for staff. (Stip. 2).

11. The inmate intake/release area is located on the ground floor. It is referred to as A-pod. All new inmates enter the jail and are processed here. All departing inmates are released from the area and it is also used as a staging location for inmates being transported to and from court. (Stip. 3). Central control is also located on the ground floor. (Lewandowski Tr. 67).

12. The medical unit is located on the first floor. It consists of 14 single cells; four of these are devoted to female inmates (referred to as B-pod) and the other ten are for male inmates (C-pod). (Stip. 4).

13. The Sheriff's administrative offices are located outside the jail's security perimeter on both the ground floor and the first floor. (Lewandowski Tr. 46).

14. Floors two through six contain the inmate housing units. (Stip. 5). Housing units are located on those floors in both the North and South towers. There are a total of 432 general housing cells in the

---

**2.** The Defendants filed a motion to exclude Ventura's testimony (Doc. No. 61), arguing that she "lacks the required training, experience and education to provide expert testimony on issues of jail security and the physical conditions of the Mahoning County Jail in this case." This motion is overruled, the Court finding that Dr. Ventura possesses the requisite credentials, *see* Plaintiffs' Exh. 41, and that those credentials do provide an appropriate foundation for her opinions. *See* Fed. R.Evid. 702; *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993); *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 152, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999); *Berry v. City of Detroit*, 25 F.3d 1342 (6th Cir.1994).

facility, i.e. 144 cells each on floors two, four, and six. (Lewandowski Tr. 49).

15. Floor six contains four housing pods. The pods on the this floor house male, medium security inmates. (Stip. 7). Pods R and U are located in the South tower. Pods S and T are located in the North tower. The four pods are identical. Each is two stories high and each occupies the sixth and seventh floors. There are 36 cells in each unit. The cells are located on the three outer walls of each unit. There are 18 cells on the first floor and 18 cells on the second floor of the unit. The cells are approximately 70.35 sq. ft. and contain a sink/toilet combination and at least one bunk. Each cell is equipped with an intercom, which is intended to allow two-way communication between the inmates housed in the cells and the guard or Central Control. (Stip. 14).

16. The cells surround a day area on the first floor, which contains tables, seats, a microwave oven, washer/dryer and shower. The day area of each housing unit is approximately 2,660.44 sq. ft., which includes an outdoor recreation area of 380.94 sq. ft.; however, the outdoor recreation areas have not been used since July 3, 2004. (Stips. 14; 38).

17. Located in the day area is a podium for the housing unit guard. The podium is equipped with a computer. The computer allows the guard to operate the cell doors of the unit, the lights and intercom. The guard also controls the ingress and egress to the unit from the computer. (Stip. 14).

18. An indoor gymnasium is located between all four pods for use by the inmates located in those pods. There is also a large room between pods R and U and also between S and T. The room is used to provide programming to the inmates located in the adjacent pods. (Lewandowski Tr. 47–50; Plaintiffs' Exh. 28).

19. The Fourth Floor contains pods L, N/O, P and Q. All pods are two stories high and occupy both the fourth and fifth floors. The building footprint for these floors is similar to the sixth and seventh floors, with an indoor gymnasium and program areas between the pods. N/O and P are located in the North tower and pods Q and L are located in the South tower. Pods L, P and Q are identical to the pods located on the sixth floor. These pods house male, maximum security inmates. (Stip. 14).

20. N/O has the same basic design as the other pods, except that it is split down the middle by a solid wall. Pod N houses inmates in the mental health classification and pod O houses the male disciplinary classification. Each side has its own separate entrance. Each side consists of 18 cells (nine up and nine down). Each side has a day area with tables, seating, microwave, a washer and dryer, showers and toilet. The cells are identical to all other cells previously described. (Stip. 14; Plaintiffs' Exh. 28).

21. There is a control booth located at one end of the unit between N and O. The control booth is framed by glass approximately halfway up so that the officer can observe both pods at the same time. The control booth contains a computer to control the range similar to that on the other pods. (Stip. 14; Plaintiffs' Exh. 28).

22. The second floor contains pods D/E, F/G, H/I, and J/K. (Stip. 14).

23. The F/G pod is identical to the N/O pod as described above. (Stip. 14). It is designated as the classification pod. Inmates are held in the unit until space becomes available in a general housing unit consistent with their classification. (Santanamas Tr. 635–36). The F side is male, non-violent and the G side is male, violent. (Stip. 14).

24. The pod design for D/E, H/I and J/K is the same as that of the sixth floor. The only exception is that each pod has an area where six cells (three up and three down) are separated from the rest of the unit by a block and glass wall. The six cell pod has its own small day space. There is one podium for the housing officer located in the day area of the 30 cell unit, which serves both areas. (Stip. 14; Plaintiffs' Exh. 28). The pods house the following inmates:

D—30 cells—Female medium
E— 6 cells—Female trustees
H—30 cells—Male trustees
I — 6 cells—Male admin. Segregation—Juveniles
J — 6 cells—Female disciplinary segregation
K—30 cells—Female maximum security

25. The jail was designed to be operated as a direct supervision jail. It was originally staffed so that it could be operated in that fashion. Direct supervision places an officer in the housing pod with all of the inmates and the officer interacts with the inmates throughout the day. The advantage of direct supervision is that the guard has more control over the inmates. All of the housing units in the jail are designed in the direct supervision style, with the exception of N/O and F/G, where the guard is stationed in a booth immediately at the end of, and in between, both ranges. This style of supervision is called podular remote. The same would be true for the small segregated areas on the second floor, i.e. J, I and K. (Billy Tr. 96; Lewandowski Tr. 53–56).

26. The housing capacity of the Justice Center when it was originally opened was 432, with a holding capacity of 24. (Stip. 8). The 24 represented the 14 medical cells and the 10 booking and holding cells. (Lewandowski Tr. 52). All of the cells on floors two, four and six were single occupancy cells. This capacity level was approved by the Ohio Department of Rehabilitation and Correction, Bureau of Adult Detention. (Stips. 7; 8).

### D. Description of the MSJ

27. The Sheriff also operates the Mahoning County Minimum Security Jail. The MSJ is located one block away from the Justice Center. In approximately 1995, the County modified an existing building and converted it into MSJ. The MSJ originally only housed misdemeanor inmates; however, it is now permitted to house and does house minimum-security inmates. (Stip. 15).

28. The MSJ is a two-story building with two distinct wings for inmate housing. Each wing is at the end of a hall. There is a central control booth located off the hall between the two units. (Stip. 15). All of the housing units at the MSJ are dormitory-style housing. There are no cells. (Ventura Tr. 238).

29. The housing units are labeled A/B and C/D. The A/B units are separate housing units located adjacent to each other at the west end of the building. Each unit has 24 bunks, a day area and a bath/shower area. The units do not have intercoms. (Ventura Tr. 237). Immediately outside of the unit is a small guard area where an officer can observe both units through glass at the same time. There is also a small guard podium located in each unit. The C/D unit is actually one housing unit containing 48 bunks with a day area and bath/shower area (Stip. 16; Plaintiffs' Exh. 33, pp. 34–36). The unit does not have an intercom. (Ventura Tr. 237).

30. The housing capacity at the MSJ is 96. The Sheriff has used boats/cots to house additional inmates at the MSJ. The highest number of inmates housed at one time in the MSJ during 2003 was 112. Only male inmates are housed at the MSJ. (Stip. 16).

31. The MSJ was also designed and staffed to be operated as a direct-supervi-

sion jail, with a guard being placed in each housing unit. (Lewandowski Tr. 41).

### E. Status of Prisoners

32. Statistics on the breakdown between pretrial detainees and convicted prisoners at the Justice Center are not kept. However, a one-day total for January 23, 2003 shows 454 prisoners. Of those, 313 (69%) were pretrial detainees; 141 (31%) were sentenced inmates. (Stip. 24).

33. The MSJ houses only sentenced inmates. (Stip. 24).

34. Many inmates incarcerated at the Justice Center and at the MSJ are incarcerated for several months, and sometimes over one year. (Baird Tr. 378; Scott Tr. 425; Baxter Tr. 489; Burton Tr. 354; Hamond Tr. 505).

35. The Sheriff, in addition to housing inmates in his custody, also house inmates in the custody of the U.S. Marshal. The Sheriff has been housing federal inmates for several years. Pursuant to a contract entered into between the Sheriff and the U.S. Marshall in the summer of 2003, the Sheriff houses approximately 100 federal prisoners per day at the Justice Center. Many of the prisoners are pretrial detainees (Stip. 25).

### F. Variances

36. On January 8, 2003, Sheriff Wellington asked the Ohio Department of Rehabilitation and Correction to issue a variance to housing standard 5120:1–8–04 of Ohio's Minimum Jail Standards, which requires single occupancy cells. The Sheriff asked permission to double bunk in the following areas, which house minimum and medium security inmates.

| | |
|---|---|
| D pod | (female medium housing) |
| E pod | (female minimum-workers) |
| H pod | (Male medium-workers) |
| R pod | (Male medium) |
| S pod | (Male medium) |
| T pod | (Male medium) |
| U pod | (Male medium) |

Double bunking was not to include maximum security and special needs inmates. (Stip. 9).

37. Sheriff Wellington requested double bunking for two reasons. First, the medium security housing units were overcrowded and inmate population was above the recommended capacity for the entire year of 2002. The additional inmates were accommodated by using cot/boat style bunks. The second reason for the request was the reduction of the Sheriff's budget by four million dollars. The budget reduction affected the number of staff available to safely and efficiently cover housing units. The Sheriff indicated he could solve the problems by relocating existing prisoner population into shared space (Stip. 9; Plaintiffs' Exh. 1).

38. On February 28, 2003, the Ohio Department of Rehabilitation and Correction granted the variance to the following extent:

The Sheriff was permitted by the variance to add one additional bunk in 21 of the 36 cells on S, T, U, and R pods. Fifteen cells on each range were to remain single bunked. Thus, the housing capacity was increased from 36 to 57 on each pod under the variance.

The Sheriff was permitted by the variance to add one additional bunk in 24 of the 36 cells on D/E pod and 24 of the 36 cells on H/I pod. The housing capacity was increased from 36 to 60 on each pod under the variance (Stip. 10; Plaintiffs' Exh. 2).

39. As a result of the variance, the inmate housing capacity of the jail was

raised from 432 to 564, an increase of 132 (Stip. 11).

40. The additional beds in S, T, U, R, H, and D were added in the latter part of 2003 (Stip. 12).

41. As a condition of granting the variance, the State of Ohio required that the housing units be operated as "modified dorms." The cell doors on the units were to be placed in a permanently open position and inmates were to have continuous access to the day area. The inmates were not to be locked in their cells. A guard was to be in each housing unit at all times. The state granted the variance with the understanding that it was helping the County to alleviate its crowding problem and that it expected the County to eliminate the housing of federal prisoners (Plaintiffs' Exh. 2).

### G. Non–Compliance With the Variances

42. Although the Defendants have taken advantage of the variance by adding the additional bunks permitted, they have not complied with the terms of the variance. The pods are not operated as dorms. The cell doors have not been placed in permanent open position. Inmates are not granted 24–hour access to the day area. Inmates are locked in their cells every night and many other times throughout the day. The Defendants admit that they have not complied with the requirements because they do not have enough staff to permit the operation of the units as modified dorms. (Santanamas Tr. 639, 655).

43. Not only have the Defendants added permanent bunks to 21 of the cells, they utilize cots/boats on these same ranges in the other cells. The cots/boats are placed on the floors of those cells in which an additional bunk has not been added. Cots/boats are used throughout the facility on a daily basis. (Santanamas Tr. 656).

44. At the time the beds were added, the Sheriff also added additional bunks to F/G pod. F/G pod is used to temporarily house inmates awaiting classification. The Sheriff added one bunk to each cell. The pod increased from 36 bunks to 72 bunks. The pod is normally filled with 72 inmates. (Santanamas Tr. 560). The Sheriff neither requested nor received a variance from the Ohio Department of Rehabilitation and Corrections to add the additional bunks to F/G pod. (Santanamas Tr. 635–36). The bunks replaced some cots. (Stip. 13).

45. The Defendants have not removed federal inmates from the facility as required by the variance. Even as they were applying for and implementing the variance, the Defendants were negotiating with the U.S. Marshal's office to house additional federal inmates at the Justice Center. (Santanamas Tr. 637–38).

### H. Population Trends

46. The average *daily* inmate population for both the Justice Center and the MSJ has steadily increased over the last few years, as indicated below:

| Year | Justice Center | MSJ | TOTAL |
|------|----------------|-----|-------|
| 2001 | 430 | 68 | 498 |
| 2002 | 458 | 84 | 542 |
| 2003 | 509 | 85 | 594 |

(Plaintiffs' Exh. 33, p. 6)

47. The largest increase in population has been at the Justice Center. The increase has been dramatic since additional bunks were added. The inmate population has been as follows:

| Month | Average | Low | High |
|-------|---------|-----|------|
| Sept. 2003 | 750 | 726 | 776 |
| Oct. 2003 | 740 | 705 | 788 |
| Nov. 2003 | 775 | 727 | 810 |

(Plaintiffs' Exh. 33, p. 7; Stips. 19–23, containing various population statistics).

48. The population levels greatly exceed the current approved housing capacity for the facilities, i.e. Justice Center—564; MSJ—96: combined housing—660.

The combined housing capacity has been exceeded by as many as 160 inmates at one time.

The situation is even more aggravated at the Justice Center where the majority of the overcrowding occurs. Indeed, the highest one-day total of inmates housed at the Justice Center was 709 inmates. That constitutes 145 inmates more than the non-approved capacity of 564, and 277 inmates more than the capacity of 432 (which was the approved capacity when the jail was originally opened). That is 160% more than its original capacity (*see* Stips. 19–23).

49. Robert Pace conducted an assessment of the jail in the Fall of 2003. He found inmate populations that exceeded the physical and operational capacities of the facilities. In his opinion, inmate census figures, in conjunction with staffing and physical plant inadequacies, represent an unacceptable level of occupant safety. (Plaintiffs' Exh. 35, p. 1). The Court agrees with Mr. Pace's assessment.

### I. Staffing Levels at the Two Facilities

50. Despite significant increases in inmate population, staffing levels have decreased. At the time the law suit was filed, there were significantly fewer staff members operating the Justice Center and MSJ than when the facilities were originally opened. That fact remained true at the time of trial.

51. Chief Deputy James Lewandowski, on behalf of the Sheriff, oversaw the planning and approval process for both the MSJ and the Justice Center. He was the warden for the MSJ and the Justice Center for several years until July 2001. Warden Lewandowski developed the original staffing plan for both facilities and sought and obtained approval of the plans from the Ohio Department of Rehabilitation and Correction, Bureau of Adult Detention ("BAD"), the state agency that oversees the planning and building of new jails in Ohio. (Lewandowski Tr. 33, 38; 44–45; Stip. 26; Plaintiffs' Exh. 24).

52. The original staffing level for the Justice Center was 151. (Lewandowski Tr. 60). The plan included security staff as well as administrative staff. The plan included enough deputies to have each housing pod staffed with one officer on both the morning and afternoon shifts and one officer for 2 pods on the midnight shift. The plan allowed for direct supervision of inmates during the day and evening, and indirect supervision when they were in their cells during sleeping hours. (Lewandowski Tr. 61–63).

53. The plan also included several relief/float officers to provide backup for the pod officers in the event of emergencies, relief for the pod officers and the transport of inmates within the facility for inmate activities. (Lewandowski Tr. 63–64).

54. Officers assigned to the jail were never allowed to perform tasks outside of the jail. Each staff post identified was to remain filled. No staff post was permitted to be abandoned, that is, no staff person could perform other duties, such as law enforcement duties or transportation duties outside the jail. To allow officers to perform duties other than that required by the staff post would adversely affect the safety and security of the inmates housed at the facility. Staff assigned to a post in the jail were expected to perform only the duties of that post. (Lewandowski Tr. 42–43, 64–65).

55. The staffing levels established by Warden Lewandowski and approved by the State allowed the facility to operate as a direct supervision facility. (Lewandowski Tr. 41).

56. In addition to the 151 staff at the Justice Center, Lewandowski also had additional staff who operated the MSJ. There were four staff posts each for the day and

afternoon shifts and three staff posts for midnight. On days and afternoons there was a housing officer for each of the A/B and C/D pods. There was also a float officer and an officer assigned to base (central control). On midnights there was no float position. The total staff hired to operate the posts at the MSJ was 22. (Lewandowski Tr. 40–42). The total staff level was sufficient to allow the facility to staff those posts necessary to permit the facility to operate as it was designed, i.e. as a direct supervision facility. There were sufficient staff assigned so that there was one officer assigned per housing unit, A/B and C/D, 24 hours per day.

57. The total staff of both the MSJ and the Justice Center during this period was 173 (Lewandowski Tr. 68).

### J. Prior Litigation

58. The County, its Commissioners, and its Sheriff were sued in 1992 by inmates of the old County jail. The lawsuit alleged violations of the constitutional rights of the inmates. The case was filed in the United States District Court for the Northern District of Ohio and was styled *William Cummings, et al. v. Sheriff Nemeth, et al.,* Case No. 4:92 CV 1838. As a result of the lawsuit the Justice Center was built and the lawsuit was resolved by a Consent Decree. The Consent Decree contained provisions relating to the operation of the new jail. The Consent Decree was in effect until terminated in 2001. (Stip. 27).

59. Subsequent to the opening of the Justice Center, issues developed between the parties regarding the existing staffing levels. With the parties in agreement, the Court appointed a joint expert to determine minimum staffing levels. Gerry D. Billy, the Sheriff of Licking County, Ohio, was the agreed-upon expert. (Stip. 28; Billy Tr. 87–88).

60. Sheriff Billy performed an in-depth staffing analysis of both the MSJ and the Justice Center. The analysis was performed over several weeks. Sheriff Billy talked to several staff members. He visited and toured the ranges of the jail on each shift of operation and he reviewed records pertinent to the operation thereto, including absentee records. At the time of the staffing analysis, the Justice Center was still operating as a single-celled facility. (Billy Tr. 112).

61. Based on all of the information gathered, Sheriff Billy determined the minimum number of staff posts necessary to operate the jail in a safe and secure manner. He then arrived at the number of staff necessary to fill the staff posts identified. (Billy Tr. 90–94; Stip. 28).

62. Sheriff Billy's analysis was limited to security staff only. It did not include administrative staff. The only supervisory staff considered was a shift supervisor for each shift. (Billy Tr. 89–90).

63. Sheriff Billy concluded that 150 security staff (not including administrative staff) were necessary to operate the posts identified. (Stip. 28). The staffing of the posts, as identified, was necessary for the safety and security of the jail. (Billy Tr. 94, 97). Based on his post analysis, Sheriff Billy concluded that the minimum staff necessary for each shift was as follows:

| | SHIFT | | MINIMUM STAFF |
|---|---|---|---|
| 1 | Midnights | (10:00 p.m—6:00 a.m.) | 22 |
| 2 | Days | ( 6:00 a.m.—2:00 p.m.) | 32 |
| 3 | Evenings | ( 2:00 p.m.—10:00 p.m.) | 30 |

(Billy Tr. 95; Plaintiffs' Exh. 39).

64. Sheriff Billy's analysis ensured that both facilities would be operated in the direct supervision style during the day and evening shift, as one guard was posted on each pod during those times. At the Justice Center, Billy did allow for indirect supervision (one guard for two pods) on

the midnight shift, while the inmates were sleeping. (Billy Tr. 96–97, 104–05).

65. Another set of critical staff posts, as determined by Sheriff Billy, were float positions. At the Justice Center, there was a float position for each floor of the building for each of the three shifts. (Billy Tr. 99–100). At the MSJ he provided for one float for each shift. (Billy Tr. 96). Float officers were to provide a variety of functions and were essential for the safe operation of the jail. One of the major functions of the float officers was to provide backup to the housing officers in the event of a fight on their range or other emergency. Floats also provided relief for the housing officers in the event that the pod officer needed to leave the range for any reason; and the floats were responsible for the internal movement of inmates throughout the facility. (Billy Tr. 98).

66. Sheriff Billy's staffing analysis did not permit an officer to be removed from a post to perform a different function, such as road patrol or transportation of inmates outside of the jail. Established posts were meant to be filled with a staff person. It was essential to the safe and secure operation of the jail that designated posts were staffed. (Billy Tr. 97, 99, 105–06).

This concept is also true if a staff person calls off sick or is on vacation. The post must be filled by overtime or calling in an officer who is off duty. (Billy Tr. 110).

67. The parties in the then-pending *Cummings* lawsuit submitted Sheriff Billy's staffing recommendation to the Court. The parties also agreed that an additional 12 administrative staff were necessary and required to supplement the 150 security staff recommended by Billy. The Court approved and adopted the staffing levels, ordering the Sheriff to maintain the staffing level of 150 and an administrative staff of 12. (Stip. 28; Plaintiffs' Exh. 5).

## K. Financial Difficulties Facing Mahoning County

68. Mahoning County has had consistent financial difficulties throughout the years. (Scanlon Tr. 700–02; Stip. 29). The financial difficulties have resulted in significant staff cutbacks for the Justice Center and the MSJ.

69. The County sales tax was defeated in November 1997. The tax was placed on the ballot as an emergency measure in May 1998. It passed. The tax was, however, defeated in the November 1998 election. The County faced a loss of one-third (1/3) of its revenue. Eventually, in 1999, the jail was forced to lay off 110 deputies. Several housing units of the jail were shut down and inmates were released as a result of the lay-offs. The Court modified its previous staffing order until funds were restored. (Stip. 29; Lewandowski Tr. 68–70).

70. Funding was eventually restored. At the time the Consent Order was terminated on November 30, 2001, the Justice Center and MSJ were staffed at the level recommended by Sheriff Billy and adopted by the Court. (Stip. 30; Lewandowski Tr. 71).

71. Subsequent to the termination of the Consent Decree, the Sheriff reduced staffing levels at the jail. Staffing levels fell below levels previously identified by Sheriff Billy and established by order of the Court in *Cummings v. Nemeth.* (Kountz Tr. 397).

72. The County again encountered financial difficulties. Even though the voters approved the passage of a sales tax in 2002, the Sheriff's 2003 budget was reduced by four million dollars. In March of 2003, fifty-four corrections deputies were laid off. In June of 2003 the deputies were recalled, although eight did not return. (Stip. 31). The staffing levels re-

mained below those recommended by Sheriff Billy. During this period of time the Defendants continued to use boats and cots at the facility and began adding permanent bunks to the cells identified in the variance previously obtained.

73. The County's ½% sales tax was defeated in the Spring of 2004. It was placed on the ballot again in November of 2004. It was again defeated. (Wellington Tr. 764–65). As a result of the loss of revenue, the 31 full-time staff hired were laid off effective November 5, 2004. (Kountz Tr. 405).

### L. Staffing Levels From Date This Action Was Filed (November 14, 2003)

74. November 14, 2003, the date this action was filed, only 125 security staff were on the Sheriff's payroll to work at both the Justice Center and the MSJ. At least 10 of those individuals were on leave and were unavailable to work. As a result, available security staff was no more than 115, which is well below the 150 recommended by Sheriff Billy and previously approved by the Court and significantly below the 173 that were employed under Warden Lewandowski. (Stip. 32; Plaintiffs' Exh. 6). Staffing remained at these low levels for the remainder of the year (Stip. 32; Plaintiffs' Exh. 7).

75. Plaintiffs' Exhibit 3 reflects the number of staff assigned and reporting to work each shift for each day of each month from July through December 2003. The exhibit also reflects the total inmate population for those days. The amount of staff reporting for duty each shift each day almost never equaled the number of staff assigned.

The exhibit also demonstrates that the number reporting was almost always below the number recommended by Sheriff Billy. During the six month period there were 184 days and 552 shifts to be staffed (184 days × 3 shifts per day = 552 shifts

to be staffed). Only 13 of the 552 shifts were staffed as Billy recommended. The rest were staffed below Billy's recommendation and most were not just a few off, but were significantly below. (Plaintiffs' Exhs. 3; 16; 33, pp. 8–10). The chart below, taken from the numbers in Plaintiffs' Exhibit 3, demonstrates the following for the 30 days in the month of November 2003.

| Day Shift (6:00 a.m.–2:00 p.m.) | | |
| --- | --- | --- |
| Billy's Recommended # of Staff | # of Staff Reporting for Duty | # of Days So Reported |
| 32 | 18 | 1 |
| 32 | 20 | 2 |
| 32 | 21 | 1 |
| 32 | 22 | 2 |
| 32 | 23 | 5 |
| 32 | 24 | 4 |
| 32 | 25 | 4 |
| 32 | 26 | 4 |
| 32 | 27 | 4 |
| 32 | 28 | 3 |
| 32 | 29 | 0 |
| 32 | 30 | 0 |
| 32 | 31 | 0 |
| 32 | 32 | 0 |

| Midnight Shift (10:00 p.m.–6:00 a.m.) | | |
| --- | --- | --- |
| Billy's Recommended # of Staff | # of Staff Reporting for Duty | # of Days So Reported |
| 22 | 11 | 2 |
| 22 | 12 | 1 |
| 22 | 13 | 6 |
| 22 | 14 | 5 |

| | | |
|---|---|---|
| 22 | 15 | 9 |
| 22 | 16 | 5 |
| 22 | 17 | 2 |
| 22 | 18 | 0 |
| 22 | 19 | 0 |
| 22 | 20 | 0 |
| 22 | 21 | 0 |
| 22 | 22 | 0 |

76. Robert Pace conducted a staffing analysis of the facilities in the Fall of 2003. His staffing analysis, like Sheriff Billy's, was limited to security staff and did not encompass administrative staff. (Pace Tr. 153–54; Plaintiffs' Exh. 35, p. 33).

77. In performing his analysis, Mr. Pace made several tours of the jail, talked to staff and reviewed records. (Pace Tr. 128–30, 133). Like Billy, he determined the staff posts that were necessary to operate the jail safely and securely. Based on the staff posts identified, he then determined the amount of staff needed to fill the posts. (Pace Tr. 130).

78. Mr. Pace found the Justice Center and the MSJ are staffed at levels considered inadequate for *daily* confinement supervision and facilities operations. Incidents resulting in officer injury are excessive both in number and extent, resulting in a workplace deemed by the consultant to be unsafe. (Plaintiffs' Exh. 35, p. 1).

79. The posts identified were very similar to Sheriff Billy's. The ultimate number of staff necessary to fill the posts was also very similar. Mr. Pace recommended the staffing of 29 officers for both the day and evening shifts with three additional officers to work part of each shift. Mr. Pace also recommended 22 officers for the midnight shift. Mr. Pace also required two supervisors per shift, which was one more per shift than required by Billy. Pace determined that the minimum number of staff necessary to fill the identified posts critical to maintaining the safety and security of the jail was 165. (Pace Tr. 154–55; Plaintiffs' Exh. 35, pp. 33–35).

80. Between February 27, 2004 and August 31, 2004, the Defendants hired 31 full time staff to work in the Corrections division. (Plaintiffs' Exh. 8). As of September 30, 2004, there were 147 security staff employed by the Defendant for both the Justice Center and the MSJ. (Plaintiffs' Exh. 8A; Stip. 34).

81. Sometime after the lay-off and before the trial of this cause, the Sheriff assigned most of his staff, including the road patrol, to the jail. The only exception were the 25 staff assigned to provide Courthouse security. (Kountz Tr. 399). Also on the eve of the trial, the Sheriff called back 10 of the 31 laid-off staff. (Wellington Tr. 769–71; Santanamas Tr. 673). Although the Sheriff contends that there are 173 staff assigned to the jail (Santanamas Tr. 673–78), this number does not accurately reflect the staff who work posts dedicated to the jail. A certain number of the staff who report to the jail never work a post at the jail. For example, six to eight deputies are automatically assigned to other positions, such as the Juvenile Justice Center, County Court and federal transport. (Kountz Tr. 399; Guzzy Tr. 464–66, 473).[3] Also, officers assigned to jail duty are frequently pulled off their post to perform law enforcement functions, or other non-jail duties. (Guzzy Tr. 466–68). Many posts at the jail go unfilled.

---

**3.** Sheriff Wellington testified that he was required to supply the full 21–deputy contingent for security at the Mahoning County Court House on the day after Thanksgiving in 2004 even though, due to four deputies calling in sick for both the Court House contingent and the jail contingent, he was seriously short-staffed at the jail *and* even though there were only two judges working in the Court House on that day. (Wellington Tr. 770–71).

The jail remains significantly understaffed and the jail continues to be a very dangerous place. (Ventura Tr. 210, 215, 222, 225, 226; Patterson Tr. 480; Guzzy Tr. 473).

82. Staff shortages create a lack of backup. There is not enough staff to respond to emergencies. (Guzzy Tr. 473; Patterson Tr. 480; Russo Tr. 335). Floats normally provide the backup; however, when there are staff shortages the floats are usually the first positions eliminated. The floats are used to fill other positions both outside and inside the jail. (Russo Tr. 336).

83. Due to staff shortages, staff fear for their safety and the safety of the inmates. (Patterson Tr. 480; Guzzy Tr. 473; Russo Tr. 333; Pace Tr. 157).

84. Frequently during 2003 and 2004 there were only two officers assigned to the MSJ. Indeed, that was the norm. One officer was assigned to the control booth and the other officer circulated between the housing units, which were located at either end of the building. (Russo Tr. 331; Miles Tr. 303–05). The officer in the control booth was responsible to operate the doors which provided ingress and egress to the facility, to monitor the CCTV and to perform other tasks. (Russo Tr. 332).

85. Frequently during the course of a shift, the housing officer at the MSJ would be called out of the MSJ, leaving only one staff member in the control booth responsible for 96 inmates. (Russo Tr. 331–32; Miles Tr. 303–05).

86. In the event of an emergency at the MSJ, backup assistance was to be dispatched from the Justice Center. There have been times when the officer in the control booth has left the booth to assist the other officer in the MSJ with the emergency. Backup from the main jail could not immediately get into the facility because the doors were locked and there was no guard in the control booth to unlock the doors to the facility. (Miles Tr. 306–07; Russo Tr. 334).

87. There have been other times when the guard in the MSJ left the booth unattended and persons were either locked into or out of the facility. (Miles Tr. 309–10).

88. Due to the insufficient staff at the MSJ there have been occasions when civilians who provide programming for jail inmates have been asked to assist with security functions. (Miles Tr. 310).

### M. Discipline Issues

89. Disciplinary logs for the year 2003 indicate that there were a total of 206 fight charges and 38 assault charges lodged against inmates of the facilities. The months of October and November recorded the highest number of fighting and assault charges. For each month there were 30 fights charged and 5 assaults charged. (Stip. 36). Thirty-three percent (33%) of the incident reports occurred in October. Thirty-seven percent (37%) of inmate injuries from assaults occurred in October. (Ventura Tr. 218). The jail was a dangerous place that was out of control. (Ventura Tr. 218, 220).

90. Incident reports for 2003 (through October) reflected the following information:

41 "inmate-on-inmate" assaults

11 "inmate-on-staff" assaults

14 miscellaneous incidents of violence or uses of force

Incident reports only reflect fights and assaults that result in injury. (Stip. 36; Santanamas Tr. 642). Incident reports do not reflect fights that do not result in medical treatment for harm resulting to the inmate. (Santanamas Tr. 642).

91. There are fights and assaults which are not witnessed or observed by staff. (Ventura Tr. 214, 217, 226). Some are not reflected in the incident reports or disci-

plinary records because they were neither witnessed by staff, nor reported to staff by the inmates. (Scott Tr. 437–39; Hamond Tr. 513). Plaintiff Leland Scott observed fights and assaults that took place at the MSJ in the bathroom out of sight of TV cameras and out of the presence of guards. (Scott Tr. 437–39). Fights occur in the day areas and while double-celled inmates are in lockdown. (Guzzy Tr. 472).

92. Plaintiffs' expert, Lois Ventura, reviewed disciplinary and security logs for the period of July 2004 through December 2004. The incidents of fights, assaults and violence were similar to and even worse than what was observed in 2003. (Ventura Tr. 222–25).

93. All of the experts agree that there was no standard to determine what is an acceptable/non-acceptable level of violence. (Billy Tr. 114; Pace Tr. 160; Ventura Tr. 221). The experts who testified in Plaintiffs' case made it clear that the level of violence at the Justice Center and MSJ were higher than at other facilities with which they had experience. (Ventura Tr. 221–24; Pace Tr. 159–60; Billy Tr. 114).

94. The conditions at the Mahoning County Jail for 2003 and 2004 were unsafe and placed inmates as well as staff at a high and unreasonable risk of harm. (Ventura Tr. 226).

95. Staff shortages due to an insufficient number of staff on the payroll and the transferring of staff from an assigned jail post to perform non-jail-related functions created unsafe and dangerous conditions at the jail, subjecting inmates to an unreasonable risk of danger. (Ventura Tr. 193, 226; Plaintiffs' Exh. 33, pp. 10–12). The lack of staff and/or reassignment of staff to non-jail duties created an inability to effectively monitor inmates and respond to critical incidents. (Pace Tr. 143–45).

96. Entries by staff in supervisors' logs demonstrate that supervisory staff was concerned about safety due to the lack of adequate staffing. (Plaintiffs' Exh. 19). An entry on October 5, 2003 states, "Nine deputies working, plus one overtime, unsafe working conditions." (Plaintiffs' Exh. 33, p. 18). An entry on October 22, 2003 states, "Unsafe working conditions due to only nine deputies working." (Plaintiffs' Exh. 33, p. 18).

### N. Lockdowns

97. As a result of a lack of staff or officers being reassigned from jail staff posts to perform non-jail functions, inmates at the Justice Center are frequently locked down for lengthy periods of time. (Ventura Tr. 193, 207–13; Plaintiffs' Exh. 33, p. 12; Pace Tr. 143–45; Russo Tr. 335–37, 340; Miles Tr. 287–99; Patterson Tr. 481, 484, 485–86; Guzzy Tr. 473).

98. A review of supervisors' logs for 2003 shows the frequency of lockdowns during the day and afternoon shifts for some or all of the pods.

| | |
|---|---|
| March 2003 | Pod lockdowns occurred 15 of 27 days |
| April 2003 | Pod lockdowns occurred 19 days |
| March 2003 | Pod lockdowns occurred 15 days |
| June 2003 | Pod lockdowns occurred 16 days |
| July 2003 | Pod lockdowns occurred 7 days |
| August 2003 | Pod lockdowns occurred 15 days |
| September 2003 | Pod lockdowns occurred 21 days |
| October 2003 | Pod lockdowns occurred 18 days |
| November 2003 | Pod lockdowns occurred 14 days |

(Plaintiffs' Exh. 33 pp. 13–14).

99. The periods of lockdowns varied, but inmates could be locked down in their cells for several hours or up to three days at a time. (Russo Tr. 337, 339; Baird Tr. 379–81; Miles Tr. 297–99; Pace Tr. 142; Patterson Tr. 485).

100. Even though additional staff was hired, during 2004 lockdowns continued with similar frequency and duration. (Ventura Tr. 212; Miles Tr. 297; Baxter Tr. 441–42; Burton Tr. 359–64; Hammond Tr. 507–09; Patterson Tr. 485; Guzzy Tr. 473; Defendants' Exh. N). The situation became much worse in November 2004 after the lay-off of the 31 staff members. (Baxter Tr. 491–92; Burton Tr. 359–64; Russo Tr. 343–44; Defendants' Exh. N).

101. Lockdown logs were kept by jail staff beginning in July 2004. The logs continued to show a pattern of lockdowns due to staff shortages, including staff reassigned from jail positions to non jail duties. (Defendants' Exh. N).[4]

102. The frequent lockdowns were exacerbated by the fact that toilets in the cells often did not work. Inmates were locked in their cells for hours, sometimes days, with toilets that accumulated the waste of the two inmates housed in each cell. The situation was unhealthy and created tension and anxiety among the inmates. (Russo Tr. 339; Knight Tr. 275, 277, 265; Burton Tr. 367; Baxter Tr. 416; Hammond Tr. 576; Ventura Tr. 229–30).

103. Mr. Knight testified about the smell of urine, body odor from the inmates, and fecal matter in the toilets. (Knight Tr. 265). He also testified about fecal matter exposing the inmates to the possible transmission of Hepatitis A. (Knight Tr. 265).

104. Inmates were locked in cells with intercoms that often did not properly function. (Patterson Tr. 485; Guzzy Tr. 472; Kountz Tr. 406–07; Ventura Tr. 233). Intercoms are the only way an inmate locked in a cell can communicate with staff.

105. As a result of lockdowns, inmates frequently missed programs that were scheduled during a lockdown period such as visitation, recreation, religion or various counseling programs. (Russo Tr. 342; Miles Tr. 295–99; Baird Tr. 380–83; Patterson Tr. 484; Baxter Tr. 495–96; Hammond Tr. 510).

106. Lockdowns created much tension and anxiety among the inmates. (Pace Tr. 134, 138; Russo Tr. 337, 341; Miles Tr. 300–01; Baxter Tr. 492–93; Patterson Tr. 484–85; Guzzy Tr. 471; Baird Tr. 385).

107. Due to lockdowns, inmates only had a limited period of time to use the phones, showers, microwaves and other amenities on the range. Often there was not enough time for everyone to use the amenities available. Inmates would argue and fight over the use of these items. (Russo Tr. 337, 341; Baxter Tr. 493; Hammond Tr. 511; Patterson Tr. 484–85; Scott Tr. 428–29).

### O. Lack of Training

108. Due to a lack of funding and a lack of staff, there has been no in-service training for staff since 2001. (Pace Tr. 150; Kountz Tr. 408).

109. No fire drills were conducted from 2001 until the Spring of 2004. The fire drill conducted in 2004 involved only one shift and did not involve the movement of any inmates. (Ricketts Tr. 750, 752).

---

**4.** At trial, the Defendants tried to argue that lockdowns were for short periods of time and were done on a rotating basis. (Santanamas Tr. 568–69). It is clear that the testimony offered by Warden Santanamas was not accurate. The chart compiled by the Warden the night before trial was suspect and, on questioning, proved inaccurate. (Santanamas Tr. 644, 647–54).

110. Plaintiffs' expert, Robert Pace, found that staff assigned to the Justice Center and the MSJ have little or no training and policy direction to perform at levels compliant with minimum confinement standards. (Plaintiffs' Exh. 35, p. 2).

### P. Security Breaches

111. There are serious security breaches at both facilities.

112. In August of 2004, there was a successful escape attempt at the MSJ. (Johnson Tr. 451). A month earlier, there was almost a successful escape from the Justice Center. Civilians standing outside the building tied hacksaw blades to strips of material passed down to them through the fence of the outdoor recreation area on one of the pods. The inmate, over the next several days or weeks, used the hacksaw blades to saw through the fence. These acts went undiscovered until another inmate told authorities of the escape activities. The fence was almost completely sawed before the activities were discovered. (Santanamas Tr. 682–84).

113. Other security breaches include contraband in the facility, including tobacco, drugs, razors, hacksaw blades, and cell phones. (Johnson Tr. 451). Inmates at the MSJ broke out a window and were able to receive contraband through the window from family and friends. (Johnson Tr. 452). This continued for a lengthy period of time before being discovered.

### Q. Maintenance Issues

114. Maintenance issues, in addition to problems with the toilets and intercoms have plagued the facility.

115. Several computer touch screen units were not working and were replaced in 2004. (Kountz Tr. 406–07).

116. Several CCTV which had been broken were replaced in 2004. (Santanamas Tr. 680–81).

117. Staff radios frequently stopped working, without warning, due to old and worn batteries. (Patterson Tr. 482; Kountz Tr. 406; Russo Tr. 351). The batteries were also replaced in 2004. (Kountz Tr. 406–07).

118. Each of these situations was remedied after the filing of this law suit.

119. Robert Pace found that the Justice Center and the MSJ have physical plant failures that affect adequate and consistent incident prevention and response. Such failures, in the opinion of the consultant, represent an unacceptable level of occupant safety. (Plaintiffs' Exh. 35, p. 1).

120. Mr. Knight, while doing a spot inspection on November 11, 2003, found the jail environment to be hazardous to the health of the inmates, security staff and civilians working throughout the jail. (Plaintiffs' Exh. 1, p. 1). Mr. Knight's observation concerned the cleanliness of showers, washing machines, overflowing toilets and insufficient cleaning supplies. (Plaintiffs' Exh. 9, pp. 1–2). His inspection was prompted by an outbreak of boils among the inmate population. (Plaintiffs' Exh. 9, p. 3).

### R. Legal Access

121. The Defendants provided legal access to inmates through a program provided by the University of Akron School of Law legal clinic. This program operated until September of 2003 when it was terminated due to the fact that the Defendants stopped paying for the service. (Carro Tr. 282). When the program was in operation, two or more students, working under the supervision of an attorney, would meet with inmates at the jail on a weekly basis. (Carro Tr. 281). The students would provide information, but not advice, to inmates. (Carro Tr. 280). The program was particularly important to inmates with civil right and post-sentencing issues, as

these inmates are not typically represented by counsel.

122. Since the program has been discontinued the only legal resources available to inmates are several copies of a state law book and a federal criminal statutes. (Santanamas Tr. 600; Burton Tr. 376). Many of the books are outdated. (Burton Tr. 376; Baxter Tr. 497).

123. Inmate Baird requested legal material, but could not get it. (Baird Tr. 383).

124. Inmate Scott requested legal materials to assist in the filing of a civil rights complaint and could not get assistance. (Scott Tr. 432). Inmate Scott ended up filing his action in Common Pleas Court. He stated his action was thrown out because he did not file request forms (grievance). (Scott Tr. 432). Due to a lack of legal access, Mr. Scott was not able to file an appropriate action.

### III. Applicable Law

#### A. Conditions of Confinement

■ The Eighth and Fourteenth Amendments to the U.S. Constitution place constraints on jail officials. Under the Fourteenth Amendment, the conditions of confinement for pretrial detainees cannot amount to punishment, *Bell v. Wolfish,* 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979); under the Eighth Amendment, the conditions of confinement for sentenced inmates cannot amount to cruel and unusual punishment, *Rhodes v. Chapman,* 452 U.S. 337, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981).

■ Although the constitutional source of authority is different for pretrial detainees as compared to sentenced inmates, when it comes to conditions of confine-

ment, there is no significant distinction between the interests of a pre-trial detainee and the interests of a convicted person. Both inmates want, and are entitled to, humane conditions. If a court determines that conditions of confinement violate the Eighth Amendment, it goes without saying that those conditions would also violate the Fourteenth Amendment.

■ In order to establish an Eighth Amendment violation, two requirements must be met: (1) "a prison official's act or omission must result in the denial of 'the minimal civilized measure of life's necessities,'" *Farmer v. Brennan,* 511 U.S. 825, 834, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) (quoting *Rhodes,* 452 U.S. at 347, 101 S.Ct. 2392); and, (2) "[i]n prison condition cases, ... [a prison official must exhibit] 'deliberate indifference' to inmate health or safety." *Id.* (quoting *Wilson v. Seiter,* 501 U.S. 294, 302–03, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991)). Ultimately,

a prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.

*Farmer,* 511 U.S. at 837, 114 S.Ct. 1970.[5]

■ When assessing conditions of confinement, a court must examine the totality of the circumstances and "such conditions, 'considered alone or in combination [with other conditions],' ... must amount to a deprivation of 'life's necessities,' ... before a violation ... can be found."

5. Although many of the cited cases involved actions brought against individual officials for damages results from constitutional violations, in the instant lawsuit, that is not the case. No Mahoning County official is sued in his individual capacity and only injunctive and declaratory relief is being sought, not damages. Even so, the case law is instructive on the issues.

*Walker v. Mintzes,* 771 F.2d 920, 925 (6th Cir.1985) (quoting *Rhodes,* 452 U.S. at 347, 101 S.Ct. 2392). The court must also keep in mind that "the Constitution does not mandate comfortable prisons," *Rhodes,* 452 U.S. at 349, 101 S.Ct. 2392, and any inquiry into conditions must " 'spring from constitutional requirements ..., [not] a court's idea of how best to operate a detention facility.' " *Id.* at 351, 101 S.Ct. 2392 (quoting *Bell v. Wolfish,* 441 U.S. at 539, 99 S.Ct. 1861).

> The Supreme Court has noted that
> the right to personal security constitutes a 'historic liberty interest' protected substantively by the Due Process Clause. *Ingraham v. Wright,* 430 U.S. 651, 673, 97 S.Ct. 1401, 1413, 51 L.Ed.2d 711 (1977). And that right is not extinguished by lawful confinement, even for penal purposes. *See Hutto v. Finney,* 437 U.S. 678, 98 S.Ct. 2565, 57 L.Ed.2d 522 (1978).

*Youngberg v. Romeo,* 457 U.S. 307, 315, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982). It is "cruel and unusual punishment to hold convicted criminals in unsafe conditions." *Id.* at 315–16, 102 S.Ct. 2452.

■ Although prisons and jails need not be "comfortable," neither may they be inhumane. The Constitution places on jail officials not only restraints, but also duties.

> [Jail officials] must provide humane conditions of confinement; [they] must ensure that inmates receive adequate food, clothing, shelter, and medical care, and must "take reasonable measures to guarantee the safety of the inmates," *Hudson v. Palmer,* 468 U.S. 517, 526–527, 104 S.Ct. 3194, 3200, 82 L.Ed.2d 393 (1984).

*Farmer v. Brennan,* 511 U.S. at 832, 114 S.Ct. 1970.

> [W]hen the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some re-

sponsibility for his safety and general well-being. *See Youngberg v. Romeo, supra,* 457 U.S., at 317, 102 S.Ct., at 2458 ("When a person is institutionalized—and wholly dependent on the State[,] ... a duty to provide certain services and care does exist"). [footnote omitted]. The rationale for this principle is simple enough: when the State by the affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs—e.g., food, clothing, shelter, medical care, and reasonable safety—it transgresses the substantive limits on state action set by the Eighth Amendment and the Due Process Clause. *See Estelle v. Gamble, supra,* 429 U.S., at 103–104, 97 S.Ct., at 290–291; *Youngberg v. Romeo, supra,* 457 U.S., at 315–316, 102 S.Ct., at 2457–2458. The affirmative duty to protect arises not from the State's knowledge of the individual's predicament or from its expressions of intent to help him, but from the limitation which it has imposed on his freedom to act on his own behalf. *See Estelle v. Gamble, supra,* 429 U.S., at 103, 97 S.Ct., at 290 ("An inmate must rely on prison authorities to treat his medical needs; if the authorities fail to do so, those needs will not be met"). In the substantive due process analysis, it is the State's affirmative act of restraining the individual's freedom to act on his own behalf—through incarceration, institutionalization, or other similar restraint of personal liberty—which is the "deprivation of liberty" triggering the protections of the Due Process Clause, not its failure to act to protect his liberty interests against harms inflicted by other means. [footnote omitted].

*DeShaney v. Winnebago County Dept. of Soc. Services,* 489 U.S. 189, 199–200, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989).

■ The Eighth Amendment also protects against future harm. "[A] remedy for unsafe conditions need not await a tragic event." *Helling v. McKinney*, 509 U.S. 25, 33, 113 S.Ct. 2475, 125 L.Ed.2d 22 (1993).

■ This Eighth Amendment analysis does not change merely because the conduct of some inmates may have caused or contributed to the conditions. *Blake v. Hall*, 668 F.2d 52, 57–58 (1st Cir.1981), *cert. denied*, 456 U.S. 983, 102 S.Ct. 2257, 72 L.Ed.2d 862 (1982).

**B. Legal Access**

■ The Supreme Court has held that "the fundamental constitutional right of access to the courts requires prison authorities to assist inmates in the preparation and filing of meaningful legal papers by providing prisoners with adequate law libraries or adequate assistance from persons trained in the law." *Bounds v. Smith*, 430 U.S. 817, 828, 97 S.Ct. 1491, 52 L.Ed.2d 72 (1977) (footnote omitted).

**IV. Conclusions of Law**

**A. Conditions of Confinement**

■ 1. The Court concludes that the conditions of confinement at both the Mahoning County Justice Center and the Mahoning County Minimum Security Jail violate the United States Constitution.

2. The Mahoning County Justice Center and the Mahoning County Minimum Security Jail are each well designed and constructed facilities for the incarceration of alleged felons awaiting trial, for the incarceration of sentenced felons awaiting transportation to the designated prison, be it state or federal, and for the incarceration of sentenced misdemeanants.

3. As long as the management of the two Mahoning County institutions were under federal court supervision, the staffing of the two institutions was maintained in a way that protected the security of both staff and the incarcerated individuals.

4. Since federal court supervision ceased, the operation of the two facilities has been characterized by significantly insufficient staffing, with the result that both staff and inmates are subject to violence and unsafe conditions.

5. The insufficient staffing has been the direct result of an absence of funding to enable the elected Sheriff of Mahoning County to staff the two facilities with sufficient personnel to secure the safety of both the inmates and the staff.

6. The insufficient funding and staffing has resulted in frequent lockdowns of incarcerated individuals for periods up to 23 hours a day.

7. The incarcerated persons, most of whom have not yet been convicted but are simply awaiting trial, are being subjected to conditions that amount to punishment in that they are frequently in a lockdown condition for 23 hours a day in very small cells wherein two persons are housed.

8. The frequent lockdowns are the direct result of an insufficient number of deputies available to operate the two custodial institutions.

9. The population of the two institutions far exceeds their capacity as planned and the lack of sufficient staffing has placed the safety and security of the inmates and staff at risk.

10. The monies earned by Mahoning County as a result of housing federal prisoners are under the control of the Board of Commissioners of Mahoning County, and the Board has chosen not to use all the monies for the operation of the two institutions.

11. There is no indication that the Board of Commissioners of Mahoning County or the citizens of Mahoning County

intend to take action to provide sufficient funds for the operation of the two institutions and the other activities of the Sheriff's Department.

## B. Legal Access

■ 12. In light of the loss of the services of the Akron University Legal Clinic *and* the unavailability of other legal resources, e.g., books, the Court concludes that inmates are being denied their constitutionally protected right of access to the courts.

13. Although the Court concludes that legal access has been denied, in the Court's view, lack of legal access, like the poor conditions of confinement, has been caused by lack of funding to pay the Akron University Legal Clinic which had in the past provided the necessary services to meet the constitutional requirement. The Court, however, finds it unnecessary to address legal access separate and apart from including it as one of the issues subject to consideration when fashioning a remedy.

### V. Summary Conclusion

The Court hereby declares that the plaintiff class has met its burden of proof with respect to its claims that class members (1) are being denied their constitutional rights not to be punished without due process of law and/or not to be subjected to cruel and unusual punishment, and (2) are being denied their constitutional right of access to the courts. As a result, the Court finds in favor of the plaintiff class and against the defendants.

■ The Court further concludes that, as the prevailing party, the plaintiff class is entitled to recover from the defendants attorney fees and costs in an amount to be determined at a later date.[6]

### VI. Remedy

■ The remedy in this case is subject to the provisions of 18 U.S.C. § 3626(a). The Court finds that the remedial phase of this case is sufficiently complex to warrant the appointment of a Special Master consistent with the provisions of 18 U.S.C. § 3626(f).

The Court shall follow the provisions of 18 U.S.C. § 3626(f)(2)(A), (B) and (C) in the selection of the Special Master.

The plaintiff class and the Board of Commissioners of Mahoning County, through counsel, may each submit a list of not more than five (5) persons to serve as a Special Master. The list shall be filed with the Court by 4:00 p.m. on Monday, March 21, 2005. For each name submitted, the party submitting the name shall provide a short biographical sketch of the person, outlining his or her experience that would justify appointment as a Special Master in this case.

Consistent with 18 U.S.C. § 3626(f)(2)(B), each party shall have the opportunity to remove up to three (3) persons from the opposing party's list. The time for removal shall expire by 4:00 p.m. on Monday, March 28, 2005.

IT IS SO ORDERED.

---

6. These costs shall include, but not be limited to, the cost of having the court reporter pre-

pare and file a transcript of the bench trial.